# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>)<br>)<br>)<br>STEVEN P. AMATO ) | DOCKET NO. CR-08-98-P-H |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

**COMES NOW** the Defendant, Steven P. Amato, by and through his attorneys, McCloskey, Mina, Cunniff and Dilworth, LLC, and respectfully submits the following memorandum in aid of sentencing.

### INTRODUCTION

The Sentencing Guidelines are no longer mandatory, but instead provide a "starting point" for the Court's sentencing decision. *Gall v. United States,* 552 U.S. ___, 128 S.Ct. 586, 596 (2007). District courts are now required to consider the Guidelines, but should "tailor the sentence in light of other statutory concerns, as well." *Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 570 (2007). As a result, the Court should consider all of the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 128 S.Ct. at 596. In this connection, the First Circuit Court of Appeals recently reaffirmed *Gall's* requirement that a district court's sentence not be disturbed if it is 1) procedurally sound and 2) substantively reasonable. *United States v. Thurston*, No. 05-2271, slip. op. at 4 (1st Cir. October 2, 2008). In determining the substantive reasonableness of a sentence, the reviewing court must take into account the "totality of the circumstances" and its review

of that factor will be guided by an abuse of discretion standard. *Id.* at 5.[1] The overarching principle underlying federal sentencing policy, as articulated by Section 3553(a), is to arrive at a sentence that is "sufficient, but not greater than necessary" to accomplish the other sentencing goals set out in the statute. *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008); 18 U.S.C. § 3553(a). This memorandum is intended to provide the Court with reliable information that may not be available from the customary presentence investigation in order assist the Court in making its sentencing decision.

## THE DEFENSE BACKGROUND INVESTIGATION

In support of Dr. Amato's plea for a sentencing variance, the defense commissioned the services of William B. Beck, a former United States Probation Office for the District of Maine. Mr. Beck's investigation does not attempt and is not intended to serve as a substitute for the customary report prepared by the United States Probation Office. Rather, the information generated by Mr. Beck goes beyond the background investigation of the Probation Office and provides a more in depth personal portrait of the Dr. Amato and his "history and characteristics." While this information is undeniably presented in the form of advocacy on behalf of Dr. Amato, it is well-documented, contains direct references to the factors contained in Section 3553 and therefore will hopefully assist the Court in evaluating the "totality of circumstances" that bring this complicated, interesting and anguished man before it for sentencing. For ease of

---

[1] In *Thurston*, a case involving a health care fraud of more than $5,000,000, a dramatic variance from the otherwise applicable guideline sentencing range was affirmed. The defendant in *Thurston* was subject to a term of imprisonment of 63 to 78 months that was capped at 60 months by the statutory maximum term permitted by the offense of conviction. The District Court sentenced and then re-sentenced the defendant to three months incarceration to be followed by 24 months of supervised released. By comparison, on the basis of the supporting information submitted herein, Dr. Amato requests a sentencing variance that is far less dramatic.

reference and efficiency, undersigned counsel has extracted and incorporated herein the pertinent background information from Mr. Beck's report. *See* ¶¶ 1-42, below.

## A). The Nature and Circumstances of the Offense

On June 27, 2008, Dr. Amato waived indictment and entered guilty pleas to one count of health care fraud in violation of 18 U.S.C § 1347 and three counts of tax evasion. Dr. Amato has accepted responsibility and admitted his illegal actions. With regard to the health care fraud, Dr. Amato's conduct consisted primarily (88% of the alleged dollar loss) of over-billing insurance companies for the treatment of his patients. Dr. Amato will make full restitution to the companies for his over-billing. With regard to the tax evasion violations, as the Presentence Report notes, the impetus for the illegal conduct was the marital difficulty that Dr. Amato was experiencing during the time of the offense conduct and not simply a desire to cheat the Government. Prior to this offense conduct, Dr. Amato had a long history of tax compliance. While this in no way excuses the offense conduct, it places it in context. Fortunately, the Amatos' marriage has survived this very difficult period and he now stands before the Court for sentencing with the love and support of his spouse. The Presentence Report accurately reflects that over the four year period, Dr. Amato underpaid his taxes by $ 319,675. On May 2, 2007, nearly 18 months ago, Dr. Amato admitted the tax underpayment and paid to the Government the principal amount of the taxes owed, together with penalties and interest, in the amount of $ 728,098 – more than double the amount of the principal tax owed.

**B)** **The Personal History and Characteristics of the Defendant**

1.     Steven Paul Amato was born on August 1, 1955 in Hackensack, New Jersey, the third of four children to Morris Amato and Josephine Kate Grimaldi; he was reared in a middle-class, Italian-American home in several New Jersey communities. This was the first union for both his parents who were natives of New York City where they received a high school education. He reports what was initially a "normal" childhood, playing with a number of friends and involved in local sports activities. At age nine he found great enjoyment and fascination with planting an organic garden which successfully produced vegetables. He looked forward to a time in his life when he could dedicate himself to horticultural pursuits, a dream only realized in recent years.

2.     The family was supported by Dr. Amato's father who worked as an orthopedic shoe-fitter and who eventually opened his own business in Passaic, New Jersey. His mother was busy at the home, cooking, cleaning and caring for the children. His earliest education took place in a catholic school in Saddle Brook, New Jersey, where he recalls learning Latin and serving as an altar boy for the local parish. He participated in Cub Scouts and Boy Scouts, elevating his status to Life Scout by earning merit badges in a variety of interests involving civic, camping and survival skills. These abilities allowed him and fellow scouts to raise funds for charitable projects. He busied himself with odd-jobs and he especially took a liking to tools and mechanical designs, a talent which

he employs to this day. As a newspaper delivery boy at age thirteen he learned the importance of responsibility and accountability to customers through consistency and courtesy. He soon took on a position at a nearby textile store performing inventory management and examining mill ends for damages prior to the fabric being sewn into drapes and other dry goods.

3. He initially attended Bergen Catholic High School in Oradell, New Jersey, where he joined the football team as a freshman. However, distance from home and other factors allowed Dr. Amato to convince his parents to transfer him to the more proximate Saddle Brook High School where he participated in football, track and baseball. He appreciated his courses in English, history and science but struggled in mathematics. He particularly recollects his involvement in an outdoor club where he became experienced in camping, exploring and canoeing. He cherishes the overnight trips he and other students made and now recognizes that those excursions offered him the opportunity "to do more with less" by utilizing what was at hand and by improvising solutions in the wild. He took part in the first Earth Day in 1971 by cleaning up a swamp with other class members and, as a senior, he worked on the yearbook committee. He received his high school diploma in June 1973.

4. Dr. Amato had applied to several colleges with the intention of pursuing a course of study in the sciences. Because of financial hardship, he enrolled at Bergen County Community College in

Paramus, New Jersey, in September 1973. It was at this time that his grandmother suggested that he consider a career in chiropractic. She was a strong advocate of chiropractic having had her hypertension corrected by a chiropractor in Brooklyn, New York. Dr. Amato, who as a child was often ill with sore throat, stomach pain or flu, lived with his grandmother for a week and underwent a week-long course of treatments from this chiropractor with the result that the symptoms never again returned.

5.     Consequently, in January 1976 he entered Sherman Chiropractic College in Spartanburg, South Carolina. He pursued his studies at that institution for one and one-half years but withdrew when he learned that the school was not accredited in the State of New Jersey. He transferred his credits to Palmer College of Chiropractic located in Davenport, Iowa, in 1978 and graduated from that academy in December 1979. Thereafter, Dr. Amato practiced chiropractic in New Jersey, New York and Maine. (A fuller description of Dr. Amato's professional practice is offered below at ¶¶ 18-42.)

6.     Despite the seemingly "normal" upbringing that Dr. Amato was experiencing during these formative years, there was an undercurrent of fear, anger and hostility brought on by his father's irrational and unsound behavior. He recalls that in his youngest years he was beaten by his father for misbehaving and in a furious rage his father destroyed his pet turtle. Even at the young age of four, Dr. Amato himself displayed anger and kicked a hole in the wall of the family home; his father then

6

whipped him with a belt. He remembers his sister, Marie, as a teenager returning home late from a date, when their father savagely beat her date's car with a wooden baton and then turned the baton on Marie. This sort of behavior went on for many years. In his early college years, Dr. Amato had to prevent his father from physically striking his mother. His father was a very controlling individual and Dr. Amato confesses that even as an adult he was afraid of him. He states that living with his father was like "walking on eggs," never knowing if your words or actions would annoy him and arouse his wrath.

7.     Dr. Amato is uncertain what caused his father to act in this fashion but does note that his father was one of nine children who may have felt shortchanged in life because he was burdened with the care of his younger siblings.    The situation was exacerbated when his father compounded these aggressive episodes with excessive drinking.    Despite domestic assaults, fistfights and drunk-driving occurrences, his father was never arrested.  Dr. Amato opines that local law enforcement authorities "looked the other way" when called to the scene of these events because his father worked as a part-time auxiliary policeman.

8.     By 1985 family members had helped to convince Dr. Amato's mother to seek the help of a therapist who, in turn, advised her to leave her husband, maintain her own home and pursue a divorce.   She took out a restraining order against her husband and initiated divorce proceedings. On the morning of January 25, 1986, Dr. Amato, along with

his sister Lucille, went to their mother's apartment in Wyckoff, New Jersey. Upon entering, they found both parents dead from gunshot wounds. The police later confirmed that their father had unloaded a magazine of ammunition into his wife's head and body, and then turned the gun on himself. Dr. Amato recalls this as the most traumatic moment of his life and vividly recollects the position of his parents' bodies and the abundance of blood sprayed on the walls and collected on the floor in a puddle.

9.      Accordingly, Dr. Amato notes that the healing from this horrific murder-suicide continues to the present time. Indeed, as he spoke of these events to this author, he became physically ill, bending over in gastric upset. Not long after this tragedy, he took a leave of absence from his medical practice in order to pursue personal studies in Buddhism in the hopes of better understanding the fragility and meaning of his own life. He trekked to a camp at the base of Mount Everest in Nepal where he learned to achieve an inner peace and tranquility through reading and meditation. These exercises had helped him to cope with his unexpected loss and he continues to employ them today when control of his life appears out of grasp.

10.      Dr. Amato's older sister, Marie Simonelli (age 62), resides in Toms River, New Jersey, and is employed as an x-ray technician. In a lengthy telephone conversation, she attested that Steven was the victim of extensive emotional and physical abuse inflicted upon him by his father's

rage and efforts at control. He would be slapped, punched and belittled by his father's words. Moreover, Mrs. Simonelli believes that her father took out his anger upon the children if he could not control other aspects of his own life. She was tearful in her presentation and attested that she and all the family "were marked by this upbringing." She points out that the murder-suicide of her parents was not beyond possibility as she had always felt that such an incensed relationship could result in disaster. She acknowledges that her brother was traumatized upon the discovery of that event and to this day exhibits symptoms of physical duress when speaking of those occasions. She hopes that he will take the opportunity to pursue positive changes in his life. In all, she verbalizes a strong support for her brother and recognizes him to be an exceptional care-giver who possesses the innate skills to pursue and exercise his chiropractic career. (SEE ATTACHED LETTER 1)

11.    Dr. Amato's sister, Lucille Freimark (age 60), lives in Sterlington, New York; she has declined to be interviewed because of her possible connection to this criminal case. Her husband, Donald, is co-founder of Freimark, Blair & Co., Inc., located in Ramsey, New Jersey, a securities brokerage firm that managed some of Dr. Amato's investments.

12.    Dr. Amato's younger brother, Paul (age 45), resides in Pittsburgh, Pennsylvania; he is an attorney who practices largely in the labor-employment field. He also holds the rank of Colonel with the U.S. Marines Reserves. Paul maintains a "close" relationship with his brother

although the pair has not seen one another for several years, yet they speak telephonically approximately once or twice each month. Paul confirms that Dr. Amato grieved for a long time following the death of their parents, an event he describes as "distressing." Paul's memory of his parents differs from that of his brother as Paul acknowledges that his father's parenting skills were "old school"; yet he credits his father with helping to form his own professional and military careers. Paul feels that his brother has to move on with his life and find a new direction. He loves his brother deeply and portrays him as a self-sufficient, independent, industrious and hard-working individual. (SEE ATTACHED LETTER 2)

13. A bright point came into Dr. Amato's life in 1988 when he met Linda Anne Dominguez. She was born in New Jersey but her family soon moved to Texas and eventually to California. Linda, currently age 42, has a degree in filmmaking and communications from William Paterson College of Wayne, New Jersey. The couple wed in a religious ceremony in Maine in August 1992 and soon relocated to that state where they led active political and civic lives. Linda was accepted as a candidate for the Women's Entrepreneurial Program in Brunswick, Maine, which she completed with honors; she was also occupied as a photographer whose works were used in cultural and community publications.

14. When Dr. Amato expanded his practice in 1997 by accepting a part-time position as an associate chiropractor in New York City, the long-distance commute during the next several years heightened

personal and marital stress. A few years later he and his wife were considering relocating to the west coast which offered warmer winters and the opportunity for him to pursue his interest in gardening. They settled on property in Mendocino County, approximately 120 miles north of San Francisco, where they moved in June 2005 with their two dogs and all their furnishings. The property is rugged and was logged for old growth redwood many years ago. Heavy slash and debris litter a large portion of the property and runoff problems are abundant, the result of poor logging practices in the past. A variety of wildlife inhabits the area: feral pig, black tail deer, bobcat, cougar and all sorts of birdlife. In 2006 they installed a small fruit tree orchard and established two organic vegetable gardens which feed them nearly throughout the entire year. More recently, they raised a flock of laying hens and built a coop with enclosed protected environs. With the assistance of a local ranch hand they tapped two springs that supply water throughout the growing season.

15. Initially the couple had occupied a trailer on the property but has since moved into the one-room hunting cabin which they now call "home." A ten-mile dirt road leads to this cabin which is located on their property. The cabin is without electricity although power is obtained through a propane generator and solar panels. Dr. Amato is gravely concerned for his wife's safety as that area of California has been plagued in recent years by fast-spreading forest fires. Indeed, when he traveled to Maine several months ago to tender his guilty pleas before this Court, an

article describing these blazes appeared in *U.S.A. Today*. The June 26th edition of that newspaper reported that 33 major wildfires were burning nearly 190,000 acres across California. In less than one day an electrical storm had unleashed nearly 8,000 lightning strikes, a number far exceeding any normal pattern. These storms are potentially more dangerous this year as California endured its driest spring in 114 years of recordkeeping. Dr. Amato has worked with professional firefighters in the protection of his own property as well as assisting them in the struggle to control these conflagrations.

16. In a recent conversation, his wife, Linda, offers additional insight into potential dangers, noting that their closest neighbor is more than a mile away and the ongoing fires have caused some of the wildlife to approach their cabin and threaten their pets and themselves as they rummage for food. She points out that her husband is understandably depressed by his upcoming sentence and is fearful of losing his freedom, his financial security and his marriage. The couple has undergone professional counseling in the past. He confessed that he felt frustrated and resentful from the pressure "to do everything." In the initial years of marriage he tended to avoid these feelings, but more recently he has matured in his outlook and management.

17. In his attempt to treat marital difficulties, Dr. Amato reported to his counselors that he had a history of being angry. His family history was exceptionally violent, culminating in the untimely and

shocking deaths of his parents. He experienced shame and self-doubt due to the tragic and dysfunctional circumstances in which he was reared. He coped with the trauma of childhood by becoming very successful (academics, sports, career). However, some of the difficult personal issues that he confronted in childhood were carried into his marriage and resulted in marital problems. Still, the couple has developed a deeper affection in recent times and is hoping for a brighter future.

### C) The Professional Career of the Defendant

18.     As a young man, Dr. Amato's personal experience with chiropractic treatment served as a catalyst for his decision to follow a path to a chiropractic career. Following his graduation from the Palmer College of Chiropractic, he associated himself with Gary Goodmark, D.C., in Wyckoff, New Jersey, before opening his own practice in Franklin Lakes, New Jersey. During that period of time (1980-1992), he joined a variety of civic organizations and lectured throughout the surrounding communities on the benefits of chiropractic, its safety and effectiveness. He recalls encountering in those years some animosity from local medical practitioners who were suspicious of the field of chiropractic which was still new in the heath-care field. Still, he opines that he successfully managed to secure working relationships with several physicians specializing in orthopedics, neurology and internal medicine.

19.     After his marriage to Linda in 1992, Dr. Amato sold his practice in Franklin Lakes, New Jersey, and the couple relocated to Maine

where he established offices in Bremen, Damariscotta and Yarmouth. His practice thrived in those years as he emphasized with patients the importance of nutrition and self-healing through exercise and lifestyle changes. From 1997 to 2004 he accepted a part-time associate position with a New York City chiropractic firm that employed specialized methods of muscle testing and kinesiological procedures that were far more progressive and offered an opportunity for advancement both in technique and in the management of more challenging cases. By accepting that position, Dr. Amato was able to expand his expertise and offer these new procedures to his patients in Maine. He resigned from that post after seven years when the commute became too burdensome.

20. Dr. Amato avows that he has been passionate in his health care profession that focuses on disorders of the musculoskeletal system and the nervous system, along with the effects of these disorders on general health. Chiropractic care, according to the American Chiropractic Association (ACA), is used most often "to treat neuromusculoskeletal complaints, including but not limited to back pain, pain in the joints of the arms or legs, and headaches." The most common therapeutic procedure is known as "spinal manipulation" or "chiropractic adjustment." The purpose of manipulation is to restore joint mobility by manually applying controlled force into joints that have become hypomobile, that is, restricted in their movement, as a result of a tissue injury. Such injury can be caused by a single traumatic event, such as improper lifting of a heavy

object, or through repetitive stresses, such as sitting in an awkward position with poor spinal posture for an extended period of time. The injured tissues undergo physical and chemical changes which can cause inflammation, pain and overall diminished function. The manipulation or adjustment of the affected joint and tissues will restore mobility, thereby alleviating pain and muscle tightness, and allowing the tissues to heal.

21.     Dr. Amato points out that chiropractic care in many instances may be the primary method of treatment. When other medical conditions exist, chiropractic care may complement or support more traditional medical treatment. His patients were assessed through clinical examination, laboratory testing and diagnostic imaging to determine when chiropractic treatment was appropriate or inappropriate.

22.     According to the publications of the ACA, "Doctors of chiropractic must complete four to five years at an accredited chiropractic college. The complete curriculum includes a minimum of 4,200 hours of classroom, laboratory and clinical experience. Those intending to become doctors of chiropractic must also pass the national board exam and all exams required by the state in which the individual wishes to practice. The individual must also meet all individual state licensing requirements...."

23.     In his practice Dr. Amato also employed homeopathic medicine, a form of health care which stimulates the body's own healing responses. He was also licensed to treat patients with acupuncture. While

these types of alternative medicines are not presently recognized for reimbursement by the Center for Medicare and Medicaid Services (CMS), they do have their own institutes at the National Institutes of Health (NIH), a division of the U.S. Department of Health and Human Services.

24.    In the development of his professional career, Dr. Amato was introduced to others in the chiropractic field, including Dr. Thomas J. Augat, also a graduate of the Palmer College of Chiropractic. In an interview at his Brunswick office, Dr. Augat, a past president of the Maine Chiropractic Association, spoke highly of Dr. Amato's credentials and found him to be a "very cerebral, deeply passionate" practitioner who was always anxious to master new avenues for advancements and expansion. He explained that most chiropractors have a personal and unique emphasis in their practice: his is sports medicine while Dr. Amato preferred nutrition. While Dr. Augat is not treating any of Dr. Amato's former patients, he is aware of Dr. Amato's reputation as a dedicated and caring provider. (SEE ATTACHED LETTER 3)

25.    While Dr. Amato generally worked his practice in Maine alone, he did hire his wife's sister, Laura Venger, as an assistant in the Damariscotta office from May 1998 to April 2001. Ms. Venger served as receptionist, scheduler and overall assistant. In a recent interview with Ms. Venger, she informed us that patients were generally sequestered into one of the three treatment rooms in his office building, and frequently were moved to another room where a particular type of chiropractic

machine was located. Treatment notes were made by hand by Dr. Amato either simultaneous to treatment or immediately thereafter, and were later entered into computerized medical records.

26.　　Ms. Venger acknowledges that Dr. Amato was, in every sense, a "workaholic" and that the office was frequently "a three ring circus." However, she explains that he was always dedicated to the treatment of his patients and was compassionate in their care. She decided to leave his practice in order to pursue her own education. Indeed, she credits Dr. Amato's enthusiasm and inspiration in achieving her college degree and she now is employed as a school teacher on North Haven Island, Maine, where she resides with her thirteen-year old son. She views Dr. Amato as kind and generous, gratefully noting that he paid for her son's day-care when she was in his employ. Ms.Venger continues to be supportive as she and her son recently traveled to California to spend several weeks at the home of Dr. Amato and his wife.

27.　　Following Dr. Amato's guilty pleas to the current charges, this writer has traveled on several occasions to speak with a number of former patients, including some who had been interviewed by federal agents. In discussion with these individuals, several common themes have emerged:

　　i)　　Many of the patients noted that they had initially sought out treatment from Dr. Amato because of their dissatisfaction with the care provided by  traditional health care practitioners;

ii)     Nearly all of the patients related that other family members pursued treatment from Dr. Amato due to the health improvement of the initial member;

iii)     Patients were unable to offer an accurate accounting of the time they spent in Dr. Amato's office for treatment because these events occurred so long ago or because his multi-tasking made if difficult to set a precise time frame;

iv)     Nearly all had indicated that they were completely satisfied with the care that Dr. Amato offered and added that they would return to Dr. Amato for treatment if he were permitted to resume his practice; and

v)     Many have continued treatment with other local chiropractors, but contend that those providers fall short of Dr. Amato's knowledge and extraordinary techniques.

Summaries of interviews with some of Dr. Amato's patients follow:

28.     **Sherry A.** (age 52) is a resident of Boothbay Harbor where she manages a family-owned restaurant, busily catering to tourists in the summer months. She had previously sought treatment from a physician and another chiropractor for migraine headaches and lower back and shoulder pain due to job-related stress. At first she questioned the nature of Dr. Amato's services, but was greatly surprised when her condition improved within a short time. He was informative and had the uncanny ability to foresee other ailments that were plaguing her. Sherry A. still feels some neck discomfort and is able to address it through the dietary supplements that Dr. Amato had introduced to her. She had stopped her treatment because of improvement in her health and she describes his approach to medicine as "healing the whole package."

29.     **William C.** (age 36) lives in Boothbay Harbor where he is the owner-operator of a spa offering massages and hypnotherapy to clients. He came to know Dr. Amato in the late 1990s for treatment of whiplash and related pain from an automobile accident; his fiancée at the time was already a patient. He had originally been treated for this condition by a medical doctor who prescribed a muscle relaxant, but he still felt discomfort. Over the years he continued with "off and on" visits to Dr. Amato to alleviate occasional back and arm distress. For approximately eighteen months during 2003-2004, William C., a licensed massage therapist, worked for Dr. Amato as a sub-contractor, performing massage therapy on patients. He would follow Dr. Amato's treatment plan for each patient and was paid a flat fee per session. Currently, William C. does undergo treatment from another chiropractor for sporadic pain, but he points out that Dr. Amato in his practice was better educated and employed the use of more advanced techniques. William C. describes Dr. Amato as a "brilliant" individual who possessed a thirst to learn as much about his profession as possible and who exhibited a passion to put it into practice. He explained that after the attack upon the World Trade Towers in New York City on September 11, 2001, he wanted to travel there to volunteer his massage and relaxation techniques on the many police, firefighters and others who were enduring physical and emotional stress during the aftermath. However, he had no place to stay until he

mentioned his aspiration to Dr. Amato who immediately invited him to remain in his Manhattan apartment for the duration of his service.

30.     **Meredith J.** (age 38) lives in New Harbor and is employed as the officer-in-charge of a nearby U.S. Post Office. Her family initiated treatment when her daughter, a pre-adolescent, was experiencing severe anxiety attacks, nightmares and headaches. A local medical doctor recommended medication for the condition, but Meredith J. was concerned that this would "only mask the problem" and, on the advice of a friend, brought her daughter, Macey, to Dr. Amato. Through the use of herbal tablets, homeopathics and a specialized diet, Macey's symptoms soon disappeared and she now enjoys a normal lifestyle. Meredith J. herself has undergone chiropractic manipulations for job-related stress and her husband, a construction worker, has also been treated by Dr. Amato following serious back surgery. Meredith J. states that her entire family is grateful for all of Dr. Amato's accomplishments and, when queried if they would return to his practice, she responded, "Absolutely." Meredith J. is treated by another chiropractor presently, but she views him as less productive than Dr. Amato. Her daughter is now able to interact with friends and she credits Dr. Amato's communication skills for the incredible improvement in her daughter's attitude and emotional health. Her daughter, now age 15, has recently told family members that she is abandoning her long-desired hope to work in the field of fashion and has

announced that she plans to study for a career in chiropractic. (SEE ATTACHED LETTER 4)

31.    **Alan B.** (age 34) is a resident of Waldoboro; he works as a designer and seller of tiles for radiant floor heating.  His wife, **Sarah B.** (age 29) is now employed as a pharmacy technician although for many years she worked as a veterinarian assistant.   Alan B. had undergone carpal tunnel surgery and began experiencing similar symptoms in his other hand.  He was successfully treated by Dr. Amato with acupuncture and other services; however, he was forced to have surgery on his wrist and elbow subsequent to Dr. Amato's relinquishing his practice.  Sarah B. explains that her mother, grandmother and sister were all patients of Dr. Amato.  She herself initiated treatment for what later was discovered to be Lyme disease.  She experienced a great deal of discomfort in her joints but through manipulation, supplements (glucosamine and chondroitin) and herbal drops, there was marked improvement.  They would "definitely" return to Dr. Amato if he were to resume his practice and Sarah B. points out that no other doctor she knows is as supportive to his patients as Dr. Amato has been.   Indeed, she will never forget that he came to her grandmother's funeral service and this occasion still impacts on her and others in the family.

32.    Because his employment with the State of Maine Fish and Wildlife Service necessitates a great deal of out-of-state travel, **Ken E.** (age 52) consented to a telephone interview.  When he had injured his

back from lifting and moving rocks, Ken E. checked the telephone directory and chose Dr. Amato for treatment since his name was one of the first listed. When he entered Dr. Amato's office on his initial visit, Ken E. was unable to stand up straight because of his injured back. He walked out of Dr. Amato's office that first day tall and erect. His health plan required a referral from his primary medical physician to undertake chiropractic care. Even after satisfying the limited number of visits per referral, his medical doctor would approve additional referrals because of improvement in his condition. Ken E. has always been satisfied with the treatments and over the years has followed Dr. Amato's advice regarding nutrition, frequently purchasing supplements. His wife and children have also been successfully treated by Dr. Amato and Ken E. relates that he is "very sorry" that Dr. Amato had closed his office.

33. **Marilyn B.** (age 67) is a widow and retired special education teacher; she maintains her residence in Bristol and works during the summer months at an antique emporium in Wiscasset. When she first encountered Dr. Amato, Marilyn B. was in pain with shoulder problems to the extent that she was unable to lift her right arm. Her primary physician referred her to a rheumatologist, but the waiting list extended for six weeks. Her doctor wanted to prescribe Pregnazone, a synthetic steroid commonly used as an anti-inflammatory in the treatment of arthritis, but she refused to take this medication because of possible aftereffects. She decided to seek help from Dr. Amato at the suggestion of friends and

underwent treatment for three months. Marilyn B. explained that the combination of manipulation, exercise, supplements and an improved diet contributed to her rapid recuperation. She also underwent acupuncture on two occasions. She continues a regimen of good eating habits, vitamins and exercise, and has had no recurrence in the past several years. Further, she had been informed by her physician that she was prone to fibromyalgia (an inflammation of the connective tissue throughout the body, resulting in muscle and joint pain, stiffness and fatigue) but this too has been arrested by her rehabilitated lifestyle. (SEE ATTACHED LETTER 5)

34.    **Sarah S.** (age 48) is an elementary school teacher who lives in New Harbor with her husband and children. She experienced chronic tooth pain, resulting in a variety of dental work, including crowns, root canal and extractions; she had also been diagnosed with gum disease. After spending thousands of dollars on dentists and physicians, she visited Dr. Amato on the recommendation of her mother. He immediately diagnosed excessive amounts of mercury in her body which were settling in her teeth and mouth. He recommended a dietary supplement to resist the bacteria causing this condition; she also had the silver fillings in her mouth replaced as they contained toxic amounts of mercury. In addition, her husband, **Allan S.** (age 49) was treated by Dr. Amato for a short time when his physician was unable to offer an explanation for a sharp pain in the heel of one foot. It became so irritated that he described it as "a nail in

my heel." On the first visit, Dr. Amato alleviated the discomfort through back manipulation, and Allan. S. reports no further episodes. For approximately two and one-half years this couple and their children had been under the care of Dr. Amato for a number of ailments and they always were satisfied with the outcome. Sarah S. is currently under the care of another chiropractor for hip and back pain, but she always found Dr. Amato to be more knowledgeable especially in the field of nutrition. (SEE ATTACHED LETTER 6)

35.     Upon my visit to the home of Sarah S., her mother, **Joyce W.** (age 70) was visiting, having recently retired to the State of South Carolina. For many years she suffered backaches, the result of an automobile accident. She was initially recommended to Dr. Amato by friends and over the years she has supported his work by suggesting to acquaintances and family that they seek out his services. In addition to chiropractic treatment, Joyce W. utilized his herbal dietary supplements. She pointed out that Dr. Amato had many long-term, repeat patients and she was especially impressed that some were nurses in the medical field. She continues to see a chiropractor but would gladly return to Dr. Amato whom she notes was unconventional in his ways but possessed "lots of talent."

36.     **Annette T.** (age 43) is a resident of New Harbor; she and her husband are employed as sub-contractors with the U.S. Post Office. Since her teenage years she has suffered "ovary problems" with a great

deal of menstrual pain. Although her first marriage resulted in the birth of a daughter, she wed for the second time and hoped to have more children. However, medical doctors advised her that it would not be possible. Riddled with Polycystic Ovary Disorder, Annette T. was without heath insurance and could not afford *in vitro* fertilization. By 2000 she experienced unusual bleeding, brought on simply by walking and doctors again viewed her as "a hopeless case." She had seen Dr. Amato's advertisement in a local newspaper and she obtained relief upon her initial appointment. Through a variety of treatments and with the proper use of dietary supplements, Annette T. returned to a regular menstrual cycle and no longer was afflicted with discomfort. In addition, Dr. Amato successfully treated her for carpal tunnel syndrome and an arthritic knee. In April 2005 she gave birth to a son, Wade. A second son, Wyatt, was born in April 2008. Annette T. relates that Dr. Amato has done more for her than anyone else in her life. He was her inspiration to return to school to study nutrition and today she views his dietary plans as being responsible for her good health and that of her children. (SEE ATTACHED LETTER 7).

37. Despite the rainy, stormy day, **Than H.** (age 55) willingly ferried from her home on Vinalhaven to meet this author in Rockland in order to offer her history with Dr. Amato personally. For more than twenty years she had been treated by medical practitioners for episodes of fatigue as well as bladder and yeast infections. Upon a friend's

recommendation, she began to visit Dr. Amato weekly for the first month and thereafter every few weeks, depending on her condition. With supplements, a dietary regimen and the ingestion of more water, within the first week she felt "like a new person." She acknowledges that he set as his objective the improvement of her immune system and overall Than H. "loved his services." Over the years Dr. Amato also treated her two daughters with success. When asked if she would return to Dr. Amato's practice, she replied, "I'll be there in an instant." She is currently under the care of another chiropractor but would much prefer the services of Dr. Amato. (SEE ATTACHED LETTER 8)

38.    **Haven S.** (36) is the daughter of Than H. and a resident of North Haven Island. A former school teacher, she now works as the assistant manager of a grocery store on that island and conveyed her feelings in a telephone interview. At the time of her second child's birth, she noticed that the baby was extremely irritable, colic and cranky. When these symptoms did not abate by the time this son was eighteen months old, at the insistence of her mother Haven S. brought him to Dr. Amato. Medical doctors were unable to successfully treat the sores around the child's mouth and Dr. Amato diagnosed the disease as "thrush," caused by bacteria transferred to the child who was being breast-fed. Dr. Amato immediately put Haven S. on supplements and vitamins and recommended a change in diet. Within a month there were significant changes in the child's temperament and, as Haven S. describes it, "He was a different

kid." She points out that all of Dr. Amato's efforts were favorable despite the cynicism expressed by medical staff when she informed them of his treatment. The family continued treatment with Dr. Amato twice a month for a total of six months. The child, presently age seven, is in excellent health and has had no recurrences. Haven S. concludes that Dr. Amato's care has helped her to lose weight and she would return to his practice because of his knowledge and insight. (SEE ATTACHED LETTER 9)

39. **Kathleen M.** (58) lives in Rockland where she works at a local public school as an ed. tech for students with special needs. Referred by several friends, she was a patient of Dr. Amato for a significant period after he attributed her discomfort to a yeast and bacteria infection. His treatment of her consisted of chiropractic manipulations, along with various devices that used electric, magnetic and light therapy. He advocated the use of herbal supplements with vitamins especially during a time of great stress when her husband had succumbed to cancer. Kathleen M. notes that she had been prescribed medication for this condition by her family physician but without any positive results. In addition, Dr. Amato successfully treated her younger son, Tim (age 28), for obsessive-compulsive disorder and anorexia. Presently they both are under the care of another chiropractor but they miss the special discernment displayed by Dr. Amato who "could tell if they were following his instructions simply by looking at them." Nonetheless, Kathleen M. is unsure if she would return to Dr. Amato's care as she feels confused by his unlawful behavior.

40.  **Sally G.** (59) is a resident of Thomaston and is employed as an ed. tech at the local school.  She had experienced consistent pain in her shoulder and, after engaging in physical therapy for a number of months, she was advised by her physical therapist to consult a physician for surgery as the therapist concluded that she suffered a torn rotator cuff. Instead, she visited Dr. Amato about whom she had learned of good results from several friends.  On the first visit, he informed her that it was a pinched nerve in the neck that was causing her discomfort.  Through manipulation she experienced immediate relief and he also treated her for a yeast infection with a diet.    Later, Dr. Amato treated her husband who was suffering dizzy spells.  She recalls her husband's statement after his first contact with Dr. Amato: "If there were more people like Doctor Amato, there would be no need of M.D.s."  She is presently being attended to by another chiropractor but Sally G. explains that he lacks holistic knowledge and techniques.  Sally G.'s mother and two daughters were also patients of Dr. Amato.  She expressed a willingness to return to Dr. Amato if he were to resume his practice.  (SEE ATTACHED LETTER 10)

41.  **Michelle S.** (39) resides in New Castle where she is busy as a full-time mother; previously she was employed as a public school ed. tech teacher.  Initially, on the advice of her mother, Sally G., she contacted Dr. Amato for care of a shoulder pain, the result of a job-related injury that was later aggravated in an auto accident.  While treating her shoulder, Dr.

Amato intuitively informed her that she was suffering abdominal discomfort, a fact which was true although she had never spoken of it to him. She faithfully followed his recommendation for dietary change and nutritional supplements. Within a short time, the abdominal distress disappeared and to this day has not recurred as long as she maintains Dr. Amato's dietary plan. Later, her husband, Michael, was also successfully treated by Dr. Amato for shoulder and back pains. The couple states that they put a great deal of trust into Dr. Amato's diagnoses and treatments. They take comfort in knowing that his practice treats the cause of an illness and not merely the symptoms. They also credit his treatment with the good health of their children and note that in conversations with other former patients it is apparent that his plans have impacted on those children who now suffer far fewer ear infections and other illnesses than does the average population. Michelle S. is very happy that they have not resorted to pills to cure their ailments and she would gladly return to Dr. Amato's care, if he were permitted to practice again. (SEE ATTACHED LETTER 11)

42. Vacation schedules prevented a personal meeting with **Jenny M.** (38), a public librarian who resides in the Town of Bremen. During a telephone interview she explained that she and her family were treated by Dr. Amato for approximately a year for a variety of conditions. It began when her two and one-half year-old son, Josiah, was troubled with a number of ear infections. Jennifer M. was determined to use

homeopathic methods to treat this condition and, at the same time, Dr. Amato was recommended to her by a friend who traveled monthly from Massachusetts for treatment by him. He immediately used a vibrator on her spine and she felt a surge of energy. In addition to her son, for several years, Jennifer M. had suffered tiredness and headaches daily, a situation she attributed to the normal care of young children by a stay-home mother. Moreover, she was border-line depressed and had suffered digestive problems for a significant time. Within a short period, all these ailments disappeared with the use of chiropractic adjustments, nutritional supplements and a corrected diet. She describes Dr. Amato as someone who "has changed my life and I miss him." In recent years she has been under the care of four other health practitioners but none has demonstrated the aggressive and certain mannerisms that were exhibited by Dr. Amato in treating her ailments. She would gladly return to his services, if possible, and would recommend him to others for health-care treatment. (SEE ATTACHED LETTER 12)

### D)    Seriousness of the Offense

Dr. Amato acknowledges the seriousness of his conduct. Indeed, he is acutely aware of it and greatly regrets his actions, not merely because he himself now faces punishment, but because he feels he has embarrassed himself and his profession and caused great pain and distress to his devoted spouse and to a family that has already endured extraordinary tragedy. He has tried to atone for his conduct by long ago paying

his back taxes, together with interest and penalties. He will also pay restitution to the insurance companies shortly after sentencing.

### E) Respect for the Law

The Government's prosecution of the defendant will certainly by itself promote respect for the law. There is no doubt that it will be a general deterrent for similarly situated physicians. In addition, Dr. Amato is anticipating that the Court will impose sentencing sanctions upon him and he is prepared to accept whatever sentence the Court determines is appropriate without anger, resentment or self-pity.

### F) Just Punishment for the Offense

The Government's prosecution of Dr. Amato will result in wide-ranging and significant sanctions against him, whatever the final sentence imposed by the Court. Dr. Amato has accepted that he will not be able to practice chiropractic medicine again. In fact, in recognition of this, Dr. Amato stopped his practice of chiropractic medicine in early 2005. The deprivation of his medical license will result in millions of dollars in lost income over his work life. It is highly unlikely that the defendant will ever again enjoy the income stream that he did as a chiropractor. He has accepted the fact that he will have to find gainful employment elsewhere, something that will be difficult to do at the age of 53 or 54. Given his age and his felony convictions, Dr. Amato's employment prospects will be limited. In addition, as noted above, Dr. Amato will make restitution to the insurance companies, and he has long ago satisfied his tax obligations and the related penalties. Dr. Amato appreciates that he alone is responsible for his predicament, but the punishments that he has and will sustain in the near future are certainly appropriate considerations for the Court in making its sentencing decision.

### G) Protection of the Public from Further Crimes

As reflected in the Presentence Report, Dr. Amato is without any prior arrest or criminal conviction and is assigned no criminal history points, placing him in Criminal History Category I. In other words, he is truly a first offender. In its paper, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (January 4, 2005), the United States Sentencing Commission determined that the fact that an offender has had minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism, *which is something the guidelines themselves do not take into account.* Indeed, the Guidelines prohibit a departure below the applicable range for Criminal History Category I. U.S.S.G. § 4A1.3(b)(2). Nonetheless, Congress had directed the Commission at an early stage of the Guidelines to ensure that the "guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or otherwise serious offense." 28 U.S.C. § 944(j).

The Commission has initiated several workshops to refine a workable "First Offender" concept within the Guidelines, but has not yet done so. Nevertheless, it has concluded that "offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points." *Recidivism and the First Offender* at 17 (May 2004). Sentencing Commissioner Michael O'Neill, after an extensive study regarding "first offenders," recommended the establishment of a "guided" downward departure for true first-time offenders, or, in the alternative, creating a new criminal history category for these offenders. Commissioner O'Neill expressed the

view that most societies, as reflected in their historical, religious and mythical writings, have created some form of fairness in doling out punishment to offenders. He argued that human intuition tells us that first-time or low-level offenders *ought* to be treated differently from those who are repeat offenders. *Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System*, 42 B.C. L. Rev. 291 (2001). In this vein, the defense believes that Dr. Amato's "first offender" status is an important factor that the Court should carefully weigh when it sentences him.

### H) The Provision of Educational or Vocational Training, Medical Care or other Correctional Treatment in the Most Effective Manner

The defendant will be requesting that the Court recommend to the Bureau of Prisons that he serve any period of incarceration imposed by the Court at a federal prison camp or low-level security institution in California that is located as close as possible to his wife's residence in Mendocino County.

### I) The Kinds of Sentences Available and The Guideline Calculations

#### *Incarceration*

Under the Sentencing Guidelines, the applicable imprisonment range is 24 to 30 months. The guideline range for supervised release is at least two years but not more than three years. *See* Presentence Report at ¶¶ 46 & 49.

#### *Fines and Special Assessment*

The special assessment is $ 100 per count for a total of $ 400. Dr. Amato will pay the Special Assessment at the time of sentencing. The statutory maximum fine range is $250,000 for each count while the Guideline fine range is $ 5,000 to $ 50,000. *See* Presentence Report at ¶¶ 52 & 53. The Court also can impose a fine in this case. Although Dr. Amato has sufficient assets to pay a fine, his assets have been greatly

reduced by the recent and precipitous stock market decline. Presently, he and his wife live entirely off the income from the existing assets. Given the amounts he has already paid in taxes and penalties and that he will shortly pay in restitution, it is respectfully requested that if the Court imposes a fine that it be at the low end of the guideline range.

## SENTENCING RECOMMENDATIONS

Striking a balance based on the factors set forth in 18 U.S.C. § 3553(a) and yet achieving at the overarching goal of a "sentence sufficient but not greater than necessary" is, of course, no easy task. Counsel for Dr. Amato respectfully suggests that a sentence of one year and one day imprisonment, coupled with a six month term of home confinement would best achieve the objectives envisioned by §3553 (a)(1) – (7).[2] Such a sentence represents a variance from the otherwise applicable guideline range, but is not a dramatic and precipitous one, as was the variant sentence in *United States v. Thurston*, supra, that prompted repeated appellate challenges by the government and yet was ultimately affirmed by the First Circuit. Here, the recommended sentence is severe enough to command respect for the seriousness of the offense conduct and deter generally others who might be tempted to engage in similar conduct. At the same time, the recommended sentence is a responsible one that is "sufficient but not greater than necessary" to comply with the sentencing directives of Congress. Moreover, the collateral consequences that Dr. Amato has and will continue to endure in the form of the loss of his career and a grave diminishment of his future income, cannot fairly be overlooked in judging the severity of the convictions and sentence from which they flow. The gravity of the loss of a medical license and the ability to use one's education and

---

[2] A sentence of one year and a day will allow the defendant the benefit of good time during incarceration. Sentences of one year or less are ineligible for good time.

training to make a living cannot be overstated, particularly in view of Dr. Amato's age. In addition, with penalties and interest, Dr. Amato has repaid to the United States over twice the amount of the principal tax evaded and he will make restitution to the insurance companies in the amount of approximately $100,000.[3] Dr. Amato's age and first offender status also support a guideline sentence variance. Studies have shown that any risk of recidivism is practically non-existent for a 53 year old first offender. It cannot be reasonably denied that looking forward, Dr. Amato presents no risk to society.

The length of Dr. Amato's jail sentence will perhaps have the greatest impact on his wife, Linda Amato. The defendant and his wife live on an isolated property in Yorkville, California, located over a mile away from her nearest neighbor and approximately one hour's drive to the nearest town. Based on careful and documented investigation, it is no exaggeration to say that while living alone, Linda Amato will have to confront dangers posed by wild animals as well as the constant threat of forest fires which have been raging close to the property. There are also difficulties associated with maintaining power to the cabin that the Amatos' occupy on the property. *See* supra at ¶¶ 15-16. A period of incarceration followed by a period of home-confinement will shorten the time that Linda Amato will have to face these difficulties alone.

The primary objective of the defense in this sentencing proceeding is to provide the Court with reliable and well-documented information concerning Dr. Amato's personal history and characteristics. There can be no denying that Dr. Amato has many redeeming virtues and that he has also suffered personal tragedies and emotional trauma

---

[3] It should also be noted that Anthem and Aetna have withheld additional payments of approximately $45,000 and $33,000, respectively, to Dr. Amato since he has been under federal investigation.

that set him apart from the mainstream first offender.  On the basis of his exhaustive background investigation, including interviews with the defendant, his wife, family members, colleagues, friends and patients, Mr. Beck offered the following assessment of Dr. Amato:

> "Steven Amato's childhood and adolescence were marked with the daily threat of verbal and physical abuse inflicted on him by a vitriolic, overbearing and inflexible father.  The feelings brought on by this treatment haunted him into adulthood and were exacerbated when at age 30 he found the bodies of his parents in a recent murder-suicide.  These events have impacted on his emotional health.  While never formally diagnosed, it appears that the tragedy surrounding his parents' deaths brought on enormous duress intensified by prior manifestations of guilt, inadequacy and anger, as the result of maltreatment.  Thus, Dr. Amato set out in his chiropractic career to be as successful as possible in order to overcome these perceived shortcomings.  Indeed, he truly lost himself in his work with long hours, numerous appointments and opportunities to generate income.  This behavior, in turn, impacted negatively on his marriage and family relationships which ultimately lead to his present difficulties.
>
> Dr. Amato is perceived by his patients as a man who is capable of performing extraordinary tasks.  His chiropractic practice has accomplished noteworthy results, bringing health and relief to many for whom traditional treatment was unsuccessful.  He focused on the importance of proper nourishment and many of his patients continue to follow his dietary plan and attribute their well-being to his diagnosis.  Undoubtedly, he possesses an innate ability to view his patients holistically.  A number of patients continue to offer their verbal support while feeling confused by his unlawful actions.  In fact, patients have related that he often treated them without charge or at a reduced fee when they suffered financial setbacks or when insurance coverage was lacking."

## CONCLUSION

This memorandum has attempted to address the specific elements under 18 U.S.C. § 3553(a) that support the conclusion that Dr. Amato's case warrants a sentence variance or a downward departure. These factors include (1) his first offender status; (2) his age; (3) his family ties and responsibilities; (4) his early family history and background; (5) his devotion to the well-being and healing of his many patients and (6) the monetary penalties and career-ending sanctions that he has already endured or that will automatically follow from his conviction. Even if the Court does not find that any one factor is sufficient for a departure or a variance, a sub-guidelines sentence would be appropriate based on the totality of these circumstances. The Guidelines are now advisory and they exist among other factors to be considered in determining the appropriate sentence. A prolonged period of incarceration is unnecessary given the various factors that exist in this case. A sentence below that Guideline range that includes both imprisonment and a period of home confinement in lieu of imprisonment is neither unduly lenient nor a diminishment of the seriousness of Dr. Amato's offense conduct. Rather, it represents a substantial deprivation of his liberty that takes into account the totality of factors that Congress has found to underlie just federal sentencing practice.

Dated at Bangor, Maine this 16th day of October, 2008.

/s/ <u>Jay P. McCloskey</u>

Jay P. McCloskey
Attorney for Steven P. Amato

McCloskey, Mina, Cunniff & Dilworth, LLC
12 City Center
Portland, Maine 04101
Telephone: (207) 772-6805
E-mail: jmccloskey@lawmmc.com

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing Defendant's Memorandum in Aid of Sentencing along with the attachments with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to the following counsel of record.

James Chapman, Esquire
United States Attorney's Office
100 Middle Street
Portland, Maine 04101
(207) 780-3257
james.w.chapman@usdoj.gov

Dated: October 16, 2008

/s/Jay P. McCloskey
Jay P. McCloskey
Attorney for Steven P. Amato

McCloskey, Mina, Cunniff & Dilworth, LLC
12 City Center
Portland, Maine 04101
(207) 772-6805

# LIST OF ATTACHED LETTERS REFERENCED IN THE MEMORANDUM[4]

1. Marie Simonelli

2. Paul Amato

3. Dr.Thomas Augat

4. Meredith J.

5. Marilyn B.

6. Sara and Allan S.

7. Annette T.

8. Than H.

9. Haven S.

10. Sally G.

11. Michelle S.

12. Jenny M.

Attached Additional Letters Not Referenced in the Memorandum

13. Cherlyn Celli

14. Ronald Calissi

15. Kent Standley

---

[4] The original letters, without redaction will be provided to the United States Probation Office.

August 21, 2008

Your Honor Judge Hornby,

Steven Amato, my brother has gone through a very difficult and abusive childhood. I being his oldest sister was witness to some harsh and cruel punishment toward Steven, especially being the first son. We grew up walking on eggshells.

My father ultimately took my mothers life and his own. This was always a pervasive Omen in mine and Stevens life. A matter of WHEN and if!

Please consider some lieney to this man my brother who has been a great healer in mine and my childrens life. Please get him help to rehabilitate emotionally. I feel Steven would be better served by mandatory in depth psychological counciling. Again please consider lieny.

Anger is distructive.

As the bible says "The sons shall pay for the sins of the fathers." Please change this

Sincerely,
Maria Simonelli

.
Pittsburgh, PA 15217

August 19, 2008

Honorable D. Brock Hornby
U.S. District Judge
United States District Court for the District of Maine
156 Federal Street
Portland, Maine 04101

**Re:    Steven P. Amato, D.C.**

Dear Judge Hornby:

I am writing on behalf of my brother, Steven, who will be appearing before you shortly for sentencing.

As Steven has pled guilty, there is no question as to his criminal liability in this matter. I write only to express to you my love and support for him as he appears before you, and to request that you use your sound judgment to apply a fair sentence to him.

While eight years older than me, I have still had the opportunity to observe Steven as a brother and as a friend for many years. He has always been a productive and industrious person. He was the first of four children in our family to pursue and obtain an advance degree – in his case, as a chiropractor. He then went on to have a productive career where he worked long hours and brought positive health benefits to countless patients. As one of his patients over the years, I can speak first hand to the health benefits his care has brought to me, and know this to be the case for many others.

Despite Steven's recent actions that have resulted in his charges and guilty plea, I am confident that, upon completing his sentence, Steven can once again be a productive and contributing member of society. Please take this into account as you ponder the sentence to be applied to him in this matter.

Respectfully,

Paul Amato

Paul Amato


cc:    Jay P. McCloskey, Esq.

**DR. THOMAS J. AUGAT**
D.C., M.S., C.C.S.P., F.A.S.A.
Certified Chiropractic Sports Physician
Fellow, Acupuncture Society of America



**DR. STEPHEN M. REDMOND**
D.C., BscKin

July 31, 2008

Hon. D. Brock Hornby
United States District Court Judge

RE: Steve Amato, D.C.

Dear Judge Hornby,

Having known Dr. Steve Amato in the past, I have been asked to write you a letter describing my knowledge and impression of Dr. Amato.

I met Steve Amato when I was the president of the Maine Chiropractic Association and got to know him during the 1990s. During that time, both of us were taking a post-graduate certification class in acupuncture and, as a consequence, saw each other several times during that series of classes that led to certification. The group of doctors attending this acupuncture certification were, in my mind, top 10% doctors. By that, I mean that these were doctors that went well beyond begrudgingly fulfilling the required continuing education requirements. These were a group of doctors interested in the human body and in expanding their practices, understanding and tools to be able to better serve their patients. They all showed a genuine interest in learning.

When we had breaks and lunches during these meetings, I would interact with everyone in the small group, all doctors I knew, but found myself repeatedly drawn to Dr. Amato and one other doctor, both of whom had a voracious appetite for knowledge about the human body and in seeking out and understanding more ways to diagnose and treat their patients. We would sit and talk in great depth about diagnosis, theory, science and treatment. I found Dr. Amato to be keenly interested and dedicated to gaining that knowledge. He was insightful and interesting in his knowledge and questions and this impressed me.

Also, during that period of time, Dr. Amato took part in discussions that the chiropractic profession was having with the acupuncturists in front of our state government and he spoke and presented himself quite professionally. I have not interacted with Dr. Amato outside of the professional arena; however, he has always appeared neat, clean and professional in appearance and has presented himself in an exceedingly professional in manner.

I am truly saddened to hear of what has occurred but I am not at all hesitant to express my opinion of this doctor as someone who seemed dedicated to serving his patients and profession.

Sincerely,

Thomas J. Augat, D.C., M.S., C.C.S.P., F.A.S.A.



August 13, 2008

HON. D. BROCK HORNBY
UNITED STATES DISTRICT COURT JUDGE

I am writing to you on behalf of Dr. Steven Amato. He is an amazing and very knowledgeable man.

I was referred to him by a co-worker/friend that was under his chiropractic care. I had been seeking treatment for my daughter's anxiety issues for well over a year and wasn't having any improving results. All of the medical doctors that I took her to wanted to put her on medication such as Ridlin, Paxil, etc. and when she was on these drugs it seemed to intensify the anxiety. I really didn't know what I was going to do or how I was going to deal with this so I took my friends advice and went to see Dr. Amato. I was a little skeptical at first because no one else could help us so far.

He adjusted her and gave us some herbal tincture and some homeopathic tablets that dissolved under her tongue in a matter of seconds and within a week I couldn't believe it was the same child. It was just so amazing that this could be happening after the chaos that we had been living. I couldn't even go the grocery store without her having a fit and "freaking out" that I wasn't going to come back.

Dr. Amato is a very caring, smart and the most knowledgeable doctor that I have ever had. He helped my daughter so much that my husband and I were under his care as well and we have all had amazing results. I am very happy with my current chiropractor but if Dr. Amato ever came back to the area I would be right there.

He has had such an impact on our lives that my daughter (15 years old) hopes to be a chiropractor one day. I hope that Dr. Amato will still be able to practice as he has helped so many people.

Thank you for your time.

Respectfully,

Meredith A.



Bristol, ME 04539

Hon D. Brock Hornby
US District Court

In the summer/fall of 2002 (age 61) I was in
pain with sore joints & muscles to the point
I couldn't turn over in bed — a frozen shoulder!

Wiscassett Family Medicine set up an appointment
with a rheumatologist which was not available for
many weeks. In the interim I had seen Dr. Amato
shingle in Damariscotta for years & Wiscassett Family
Medicine indicated he had been helpful to other patients.

Dr. Amato saved me — I have told this tale many times.
He changed my diet, recommended dietary supplements
& got my limbs moving with manipulation & acupuncture.
He kiddingly said "You shouldn't be moving like
an old lady" & taught me a simple exercise with a
belt which released that shoulder.

By the time I saw the rheumatologist I was so
improved I didn't need treatment or expensive medication.
I would recommend Dr. Amato to all who hear
the diagnosis "fibromyalgia".

During the several months of treatment Dr. Amato was professional & gracious. Whatever his "sins" may be, please remember he did *no one* harm & deserves to be free to repay any financial obligations.

Sincerely

Marilyn M. ████

P.S.

Please tell him I am in excellent health as I approach 68 & am no longer a smoker, something he strongly advocated! MB

To : Hon. D Brock Hornby, United States District Court Judge

From: Allan and Sara███████████, Bristol, Maine

Date: August 12, 2008

Re: Dr. Steven Amato


Our family knew Dr. Amato from 2003 until he moved to California. Dr. Amato was very dedicated to his patients. He looked at the patient as a complex and complete body, not just treating symptoms but helping to find the causes of those symptoms, often seemingly unrelated. He helped our family with sports injuries, work injuries, dental issues, high cholesterol and nutritional information. We had recently built our log home as a family and being in our 40's the work had definitely affected our backs. The chiropractic care was extremely beneficial.

Dr. Amata was always respectful and tried to explain his treatments and answer questions in a way we could undertand. I, Sara, have often wished he was here the last 2 years to help me make difficult choices for treatment of mercury toxicity resulting from silver amalgam fillings.

Another note: Dr. Amato sometimes employed our son to do yard work, set up the Christmas tree, etc. Luke recalls him coming into the room, after working out. He had 2 long needles sticking out of his forearm and explained that he had overdone + strained a muscle in his workout. That was Luke's first observation of acupuncture.



Hon. D. Brock Hornby

United States District Court Judge

I don't remember exactly when I first started seeing Dr. Amato, but I do believe that it was early in 1996. I continued to see him until his departure in the spring of 2005. His office was always busy, and yet he would always be able to fit you in the same day you called. The atmosphere was calming and comfortable. He always treated me with respect, kept everything confidential, and thoroughly answered the numerous questions I had for him. Dr. Amato was very persistent in finding the appropriate treatment for my Polycystic Ovarian Disease. Many times when I went into the office he would comment on how he had recently read a new research article about my ovarian disease.

Dr. Amato treated me for a numerous of ailments. I originally went to Dr. Amato due to excruciating back pain, which was originating from my ovaries. I was in so much pain that I could barely perform normal activities of daily living. Dr. Amato's main form of treatment was aligning my back. He would also use many other holistic treatments to treat me. I do not know the proper names of the equipment or treatments which were used to treat me, but I can say that they all seemed to work. Dr. Amato always encouraged lifestyle changes which included better eating habits, supplements, and vitamins.

Dr. Amato's treatments helped me in many ways. During the course of my treatment for my back pain, I noticed changes elsewhere in my body. The first thing I noticed was that my TMJ in my jaw, and headaches were gone. Then I noticed that I no longer needed my wrist braces for carpel tunnel. Next my arthritic knee pain was healed after Dr. Amato's treatments. As my numerous aches and pains started to disappear Dr. Amato began to focus more on my ovaries and fertility issues which were the root of my problems.

For the past 22 years I had been told that I had less that a 2% chance of conceiving by many different fertility doctors and by 2004 we realized that Dr. Amato's treatments had truly worked. I found out I was able to conceive, but I had a miscarriage because I fell. This gave me hope that I could have a baby but, I still had other factors against me. I would be considered a high risk pregnancy due to my age, weight, and blood pressure. Without Dr. Amato's services I truly believe I would never have been able to conceive and carry a baby to full term. I now have two sons, the first born in 2005, and the second in 2008.

Dr. Amato has changed my life. He has inspired me to look beyond traditional medicine. I have taken a few University classes on holistic medicine, and I still work at incorporating their philosophies into my lifestyle. Through the years that Dr. Amato treated me I began to looked up to him as a mentor. I asked many questions and the more I asked the more detailed and thorough explanations became. Dr. Amato is so knowledgeable in his practice, and so skillful that I only wish that he could be allowed to continue to help people as he has helped me.

Thank you for taking the time to read my letter.

Annette ███████

New Harbor Me 04554 9/27/08
677-2979

August 21, 2008

Dear Judge Hornsby,

I was a patient of Dr. Steve Amato's for several years. I went to Dr. Amato with chronic yeast and bladder infections. I had been fighting and searching for relief of these symptoms for 20 years or more.

Dr. Amato suggested diet changes, supplements and adjustments and within 1 week I felt like a new person.

My primary care physicians (2) plus a specialist never helped long term. They treated the symptoms but never the cause of the infections.

I still miss his supplement and kinesiology diagnostic ability!

I would still be seeing him for prevention and maintenance if he were still practicing.

Sincerely,
Shan J.


August 21, 2008

Hon. D. Brock Hornby
United States District Court Judge

Dear Judge Hornby,

I have been asked to write you about my experience with Dr. Steven Amato. My son, Mikael, and I began seeing Dr. Amato in the summer of 2002. We were urged to see him by my mother, who was also patient of Dr. Amato's, to see if he could help us with Mikael. Mikael was 18 months old at the time.

Mikael had been a very unhappy baby. He had colic and thrush (a yeast infection usually found in baby's mouths). I was not expecting to be treated as well, but because Mikael was so young and was still nursing, Dr. Amato decided to treat him through me. I also had too much yeast in my system. He performed kinesiology and manipulations on me and only minor ones on Mikael. He would have Mikael lie stomach down on my stomach and would use a pulsating machine on Mikael's back. Mikael loved this. When asked "What does Dr. Amato say?" he would reply "Zut, zut, zut." An imitation of the machine he used on Mikael's back. He also gave us dietary recommendations and suppliments to help us get rid of the yeast in our systems.

What he did for Mikael was amazing. We noticed a huge difference in Mikael's disposition within just one month. He was more content and much happier. He slept better, nursed less, and would even go to others, where as before, he only wanted me. I also felt much better. I had more energy and was able to loose some of the baby weight that I hadn't been able to shed up until then.

We continued to see Dr. Amato through the fall of 2002, I cannot remember the exact date that we stopped seeing him. We had scheduled visits more often when we first began seeing him, but they were further apart as time went on, until we felt that we no longer needed to see him.

I would like to add that I would continue to see Dr. Amato were he in practice today. Dr. Amato's methods may not be recognized as orthodox by the "medical community"…I know that Mikael's pediatrician brushed off the treatment that we were receiving, the same pediatrician that was not able to help Mikael up to that point. Dr.Amato cared about our well being. He actually listened to our concerns and could tell what we needed by listening to our concerns as well as our bodies. He did not recommend a bunch of tests that were not needed, and I do not feel that he gave us anything that we did not need or keep us on suppliments that were no longer effective in our treatments. He is passionate about his field of medicine.

Sincerely,

Haven

August 14, 2008

Dear Judge Hornby,

I am writing this to inform you that Dr. Steven Amato was a caring, dedicated healer. He treated me for seven to eight years. Initially he saw me for a painful left shoulder and arm. I had been seeing a physical therapist for six or seven months and she finally recommended that I see a surgeon because she felt that I had a torn rotator cuff. A friend suggested that I try Dr. Amato before seeing the surgeon, and thank God that I did. I left Dr. Amato's office that first day with less pain and hope for recovery. I received full use of my arm in about two months.

Dr. Amato once met me after hours because my husband had to drive me, I was so sick with the flu. He worked

on me for about ½ an hour and then took the time to give my husband a home-made chicken soup recipe that speeded up my recovery.

Naturally, I was disappointed and angry and puzzled as to why such a gifted person would do what Dr. Amato did: but we all do things that we wished that we hadn't. I have forgiven Dr. Amato and hope that he will learn to forgive himself.

Respectfully,
Sally

Sept. 2, 2008

Hon. D. Brock Momby
United States District Court Judge

I have known Dr. Amato for several years.
I started seeing Dr. Amato after my mother
recommended him to me. I saw the difference
he was making in my mother and grandmother's
lives (Sally Gilbert and Crystal Butman).
I liked too that he addressed the body's
nutritional needs in connection with
skeletal and muscular, treating the body
as a whole. Some of the ailments he
addressed as I recall neck and shoulder,
digestive issues and plantar fascitis.

I would consider seeing Dr. Amato again
if he were to practice. I felt he was gifted
in assessing my health and honestly
targeted the source of the problem - not just
treat the symptoms as traditional medicine
typically does and send you out the door with
a "bandaid".

I remember on one occasion I was having
internal pain and unbeknownst to him, he
picked right up on it. I was amazed that he
was able to "read" the distress signals of
my body without me uttering a word or
expressing any pain in my face. I remember
saying something like "How are you able to
know this?"

Dr. Amato was friendly and professional

and often expressed concern in a genuine manner. He often asked if I had spoken to my mother and comment that she was doing better. When my stepson was sick with high fever, told me call at night if needed

I miss him and the professional care he provided — manipulations, spinal adjustments, dietary recommendations and supplements, etc. He is very knowledgable and gifted by God. I trusted him with my whole family, including my infant son.

When I first received news that Dr Amato plead guilty I was hurt, sad, angry shocked and felt a deep sense of loss. I miss Dr Amato who had become a trusted friend to our family and am saddened that we would no longer be able to see him again or find someone as knowledgable as him.

I would like Dr Amato to know that I have forgiven him, that God has a special plan and purpose for him and that he and his family are in our prayers.

Sincerely,

Michelle M. ████████

████████████

Bremen ME  04551

August 24, 2008

To the Honorable D. Brock Hornby, US District Judge:

My name is Jenny Mayher.  I am 38 years old, the mother of two young children, and I work as a children's librarian in Damariscotta.

I was a patient of Dr. Amato in the summer and fall of 2004.  I brought my 2 year-old son Josiah to see if Dr. Amato could help treat his chronic ear infections.  He did that, and also started treating me, saying, "How can these kids get well if their mom isn't well?"  I was a complete skeptic, never having been exposed to alternative medicine before.  He treated me with energy treatments, chiropractic adjustments, supplements, and diet recommendations.  I can honestly say that I was flabbergasted when his treatments started making dramatic improvements in my health.  For years I assumed that all mothers of young children were simply exhausted all the time and that was my fate.  Dr. Amato showed me how to be well again.

After seeing Dr. Amato for 2 months I had energy all day long, slept better, and stopped having chronic headaches.  Dr. Amato is a gifted healer.  He helped my family tremendously, and we have been better ever since because of his help.

I will always be grateful to Dr. Amato.  He showed me that we do not have to be content to be "not sick" but that we have the right and the ability to actually feel well: to have energy and to live without chronic aches and pains.  This knowledge has changed my life.  I am a happier, healthier person and a better consumer of healthcare than I was before seeing him.

I recommended Dr. Amato to several friends and my father.  He helped all of them with problems they had dealt with for years and never found solutions for before being treated by Dr. Amato.  I wish he were still practicing.  I would go back to him without hesitation.

Respectfully submitted,

Jenny ████████

Cherlyn Celli
████████████
San Francisco, CA 94115
August 22, 2008

The Honorable Judge D. Brock Hornby
U.S. Federal District Court
Portland, ME 04104

Dear Judge Hornby,

I am writing this letter on behalf of my friend, Steven Amato. First, I should clarify who I am: my name is Cherlyn Celli, and I have been a close friend of Steve's wife, Linda, since the 7th grade. I live and work in San Francisco. Although I have seen Linda many times over the years, I didn't know Steven very well until they moved to California in 2005. Since then, I have visited them quite often, and I have grown to know Steven well.

I am aware of the serious circumstances that lead me to write this letter to you now. I know that Steven's offenses have caused harm to society, but I believe Steven has been working to repay his debt (literally and metaphorically). He has changed since committing the offenses for which he has been indicted. His past actions have also caused a great deal of emotional pain to Linda, and heavy stress upon their marriage, but he has been working to rebuild his personal life, as well. These past few years, I have seen him committed to working to improve their property and trying to build a better life.

A few years back, I had a very stressful job and developed persistent pain in my elbows and knees. I went to my doctor, who drew blood numerous times and gave me a battery of tests in an attempt to figure out what was wrong with me. The medical doctors couldn't find anything wrong, but I was still in pain. Although I am no fan of chiropractors, Linda suggested I ask Steve for help. Reluctantly, I did. He suggested some natural remedies and herbal supplements that I could buy. Within a few days, the pain was gone and gone for good. Over time, his suggestions have continued to help me.

Your honor, I believe Steven has become a better person. He has created a new life at the property with Linda. I do not believe he poses a threat to anyone, and his incarceration would be a waste of taxpayer's money.

Sincerely,

Cherlyn Celli

**Ronald E. Calissi**
**Attorney at Law**
Certified Financial Planner
Certified Public Manager

557 FRANKLIN LAKES ROAD
FRANKLIN LAKES, NEW JERSEY 07417
Phone 201·891·8933
Fax 201·848·9066
E-mail calissi@optonline.net

September 10, 2008

Honorable D. Brock Hornby, Judge
United States District Court
District of Maine

Dear Judge Hornby:

This writing is to request leniency for defendant, Steven Amato. His sentencing, I understand, is scheduled for some time in October.

I have known Mr. Amato for approximately 20 years as a lawyer representing his late mother's estate and also as a chiropractor in Bergen County, New Jersey. Mr. Amato made numerous contributions in the form of voluntary service to the public safety community when he often lectured on stress management to police recruits and veterans at the Bergen County Police and Fire Academy.

As a client, Mr. Amato was very helpful along with his sister, Lucille, following the violent death of his mother at the hands of his late father. This murder-suicide was a tragedy that significantly impacted Mr. Amato. Despite this he was still able to give back to the community for many years.

He is not, in my opinion, a threat to society, and was caught up in an unfortunate situation that compromised his integrity. When determining sentencing, I hope you will consider the fact that he has admitted responsibility, understands the consequences of his actions, and is sincerely remorseful. I have complete confidence that Mr. Amato has learned his lesson and will never again violate the law. Thank you.

Sincerely,

Ronald E. Calissi



**COUNTY OF MENDOCINO**
**DEPARTMENT OF TRANSPORTATION**

340 LAKE MENDOCINO DRIVE
UKIAH, CALIFORNIA 95482-9432
(707) 463-4363   FAX (707) 463-5474

**FUNCTIONS**

Administration & Business Services
Airports
County Surveyor
Engineering
Land Improvement
Roads and Bridges
Solid Waste

August 25, 2008

Honorable D. Brock Hornby,

The Mendocino County Department of Transportation (MDOT) has for many years relied on landowners with private ponds to supply water for our gravel road maintenance.

For many years, the previous property owner and Mr. Amato have allowed MDOT to draft water from their pond in order to maintain Fishrock Road, CR 122.

By allowing MDOT to draft water from these private ponds, the county not only saves on fuel cost and labor, along with wear and tear on equipment to travel the many miles to other water sources.

The Mendocino County Department of Transportation truly appreciates this cooperation with our neighbors and wishes to continue utilizing these valuable resources.

Please feel free to contact me with any questions or concerns,

Respectfully,

Kent Standley
Deputy Director, Maintenance Services
Mendocino County Department of Transportation
340 Lake Mendocino Drive
Ukiah California 95482
(707) 463-4363

cc: CR 122 road file