UNITED STATES DISTRICT COURT

                                DISTRICT OF MAINE

UNITED STATES OF AMERICA        )
                                )
        v.                      )       Criminal No.  08-98-P-H
                                )
                                )
STEVEN P. AMATO                 )

                     GOVERNMENT'S SENTENCING MEMORANDUM

    The United States of America, by and through its attorneys, Paula D. Silsby, United States Attorney for the District of Maine, and James W. Chapman, Jr., Assistant U.S. Attorney, hereby files the Government's Sentencing Memorandum setting forth the evidence and other factors that the Court should consider when determining the appropriate sentence in this case.

I.    Introduction.

    On June 27, 2008, the defendant waived indictment and pleaded guilty to one count of health care fraud, in violation of 18 U.S.C. § 371, and three counts of tax evasion for the years 2001, 2002, and 2003, in violation of 26 U.S.C. § 7201.  The health care fraud loss is over $100,000.  The total tax loss in this case is $319,675.  According to the Presentence Investigation Report, with a three-level downward adjustment for acceptance of responsibility, the defendant would have a total offense level of 17 and a Criminal History Category of I.  This produces an advisory jail range under the U.S. Sentencing Guidelines of 24 to 30 months, and a fine range of between $5,000 and $50,000.  In addition, the defendant must pay restitution to the victims of the health care fraud and pay special assessments totaling $400.

    At the Presentence Conference, the parties indicated that although there was agreement that the amount of the health care fraud loss was between $70,000 and $120,000, the exact amount owed of the loss was in dispute.  However, subsequent to the conference, the parties

came to an agreement that the amount of health care fraud loss as to Count One was $100,441.14.

The defendant argues for a guideline departure or variant sentence of one year and one day to be followed by six months of home confinement. For the reasons stated below, the Government submits that a prison term within the applicable guideline range of 24 to 30 months is appropriate in this case.

## II. Guideline Departure or Variant Sentence is not Warranted in this Case.

The defendant requests a jail sentence that, in effect, would be a departure of more than 50% below the low end of the applicable guideline range in this case. Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary," to promote the sentencing goals set forth by Congress. The Court must consider a variety of factors including: (1) the nature and circumstances of the crime and the defendant; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training; (3) the kinds of sentences available; (4) the sentencing range established by the guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution to victims. The Government submits that a fair analysis of the Section 3553(a) factors weigh in favor of a sentence within the guideline range of 24 to 30 months.

    A.    <u>Nature of the offense and history and characteristics of the defendant</u>.

Although the Presentence Investigation Report describes the defendant's history and the

nature of the offenses, the Court should be aware of some additional facts. The FBI commenced an investigation of the defendant in 2004 following a referral from Anthem Blue Cross/Blue Shield of Maine. Anthem suspected that Amato was upcoding on health insurance claims that he submitted for reimbursement. The FBI executed a search warrant at Amato's office in January 2005. In May of 2005, the defendant closed his practice after insurance companies began to request medical records to back up his reimbursement claims. He moved to northern California a few months later.

At the time of the search warrant, the defendant was a chiropractor licensed in the states of New York and Maine. He was previously licensed in New Jersey. However, he voluntarily surrendered his New Jersey license in 1992 after a complaint was filed against him about a billing issue with Travelers Insurance.

During the years 2001 to 2005, the defendant's return preparers and investment advisors told the Government that the defendant invested money wisely. According to the Presentence Investigation Report, as of the date of the report he had a net worth of nearly $3,000,000, including real estate equity totaling $900,000 with no mortgage.

1. Count One – Health Care Fraud.

From at least 2001 to 2004, the defendant executed a scheme or artifice to defraud health insurance companies and Medicare by submitting false claims forms in order to receive excessive payments. The evidence established that he over-billed insurance companies for therapeutic procedures and physical performance tests which, under the CPT Manual, are billed in fifteen minute increments. He also falsely billed for needle electromyographies that he never performed and submitted false claims to insurance companies for fictitious office visits.

The concept of "medical necessity" is the foundation of all reimbursement to providers from health care benefit programs. "Medically necessary services" are those that are appropriate and required for the diagnosis or treatment of injury, illness or disease. Each health care benefit program prohibits providers from billing for services not actually rendered or billing for services that are not "medically necessary" for the health of the patient. The insurers in this case all reimbursed for some chiropractic care but with limitations. For example, the largest insurer in this case, in terms of fraud loss, Anthem, would only pay for chiropractic care when the primary diagnosis was subluxation of the spine (when one or more of the bones of the spine moved out of position and created pressure on or irritated spinal nerves). Aetna, the victim that suffered the second highest loss, paid for chiropractic services if the patient had a neuromusculoskeletal disorder. Aetna's policies would not pay for chiropractic procedures to treat internal disorders. The policies of both Anthem and Aetna stated that they would not pay for alternative medicine treatments that it considered "experimental" or "investigational," such as Applied Kinesiology treatments. As stated in the defendant's Sentencing Memorandum, the defendant stated that he studied with a New York firm that "employed specialized methods of muscle testing and kinesiological procedures that were more progressive . . . ." He then used this expertise to treat his patients in Maine. Defendant's Sentencing Memorandum at 14. Thus, to the extent that the defendant tried to bill for these services using CPT codes written for reimbursable treatments, those billings would be fraudulent.

Many of the defendant's patients told investigators that they first sought treatment by Amato because he advertised himself as a holistic health practitioner or because he practiced "holistic" or "alternative medicine" and that they sought treatment for allergies or other internal

diseases. For example, one patient stated that she went to the defendant for treatment of hemorrhoids. Another patient stated that he sought treatment from Amato for kidney disease. The defendant's sentencing memorandum contained similar descriptions of the maladies treated by the defendant that were unrelated to back or neck injuries.

Nevertheless, regardless of the actual complaint made by the patient during the initial visit, the defendant always submitted claim forms to the insurance companies that included the diagnosis code for "subluxation of the spine." This allowed Amato to bill the insurance companies for spinal adjustments and therapeutic procedure services. Moreover, when Amato billed insurance companies for spinal adjustments, he almost always billed at the highest rate. The CPT code book provides different codes for adjustments depending upon how many of the five regions of the spine are adjusted by the chiropractor. The defendant billed the highest paying code, CPT code 98942 (manipulation of five regions), on 94% of his claim forms. Other chiropractors in the state, as a whole, billed this same CPT code on 7% of their claim forms. In this case, rather than build a case based upon medical necessity, the investigators focused its efforts on the defendant's use of CPT codes for timed therapeutic procedures and needle electromyographies.

Medical professionals are permitted to bill CPT codes for certain therapeutic procedures in fifteen minute increments. The CPT code book prefaces the therapeutic procedure codes with the following language:

> A manner of effecting change through the application of clinical skills and/or services that attempt to improve function. Physician or therapist required to have direct (one-on-one) patient contact.

AMA Current Procedural Terminology Book, page 349. The code book defines CPT code

97110 as, "Therapeutic procedure, one or more areas, each 15 minutes; therapeutic exercises to develop strength and endurance, range of motion and flexibility." Id. For example, a practitioner could bill three units of 97110 if he or she performed hands-on therapy that lasted between thirty-one and forty-five minutes. CPT code 97550 is another code that may be billed in fifteen-minute increments. This code is defined by the AMA as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes." Id. at 351. Code 95851 is another code billed in fifteen minute increments. It is defined as "Range of motion measurements and report; each extremity (excluding hand) or each trunk section or (spine)." Id. At 344.

Patients interviewed by government investigators described office visits of varying lengths that included time in the waiting room using various machines while waiting to be seen by the defendant, spending some time with the defendant while the defendant questioned them about their condition, performed a spinal adjustment, and conducted allergy tests or other tests that involved holding an allergen near that patient's head or pressing on a body part while putting pressure on the patient's outstretched arm. When the defendant's arm fell weakly to his or her side, the defendant diagnosed an allergy or an internal disorder that correlated to the allergen being held or body part that was being pressed. The patients also described the defendant's office as being very busy, with the defendant moving from room to room to several patients at the same time.

When patients were questioned about the length of their visits with the defendant, several patients testified that their entire visit to Amato lasted no more than 30 minutes, including time spent on consultation with Amato and spinal adjustments (both of which are billed under other

-6-

CPT codes). In calculating the fraud loss in this case, the Government allowed for the number of time units that could have been billed given the patients' longest estimate of total treatment time with the Defendant, and then allowed the defendant to bill at least one or two more units to make the estimated loss a conservative estimate.

According to paid claims data, on 156 separate dates, Amato billed insurance companies for time-based therapeutic procedures for patients that added up to more than nineteen hours. On at least one date, he submitted claims that billed multiple units of therapy that added up to a total of thirty-nine hours of therapeutic procedures or muscle tests.

The defendant also billed insurance companies using CPT code 95870, which is used for a specific type of needle electromyography. A needle EMG is a test used by medical professionals to exclude, diagnose, describe, and follow diseases of the peripheral nervous system and muscle. During the test, small needles connected to an electronic machine are placed into certain muscles in order to test the electrical impulses of the nerves that supply the muscles. The CPT code book describes the needle EMG codes as follows:

> **95868** Needle electromyography, cranial nerve supplied muscles, bilateral
>
> **95869** Needle electromyography; thoracic paraspinal muscles
>
> **95870** limited study of muscles in one extremity or non-limb (axial) muscles (unilateral or bilateral), other than thoracic paraspinal, cranial nerve supplied muscles, or sphincters
>
> **95872** Needle electromyography using single fiber electrode, with quantitative measurement of jitter, blocking and/or fiber density, any/all sites of each muscle studied

AMA Current Procedural Terminology Code Book, page 345. CPT code 95870 is further defined in a monthly publication of the AMA entitled, CPT Assistant.

>In conjunction with the revision of code 95869, new code 95870 was added for needle EMG of other muscles (not paraspinal), for example abdomen and thorax.

CPT Assistant, November 1977, at p. 46.

Investigators asked patients if the defendant ever performed any procedures that involved needles, including acupuncture. If a patient answered "no" to this question and the defendant billed an insurance company using CPT 95870, then the claim was considered fraudulent.

The total amount of health care fraud loss reported in the Presentence Investigation Report is $111,251.94. This figure is based upon information provided to Probation by the Government during the presentence investigation. After the Presentence Conference, the defendant provided the Government with additional information to consider. The Government's summary witness then reviewed his earlier loss calculations and revised the calculation. The Government now believes that the total loss resulting from Count One is $100,441.14. This figure was agreed to by counsel for the defendant and by the victims for purposes of the Government's loss calculation as to Count One.

The amount of loss per victim breaks down as follows:

| Victim | Loss |
|---|---|
| Anthem | $71,315.66 |
| BC/BS Delaware | $6424.61 |
| Aetna | $15,713.12 |
| Cigna | $4455.15 |

| Victim | Loss |
|---|---:|
| Progressive[1] | $725.00 |
| Mailhandlers | $313.00 |
| Harvard Pilgrim | $1213.80 |
| Medicare | $280.80 |
| **Total** | **$100,441.14** |

    2.    <u>Tax Evasion – Counts Two through Four</u>.

During the course of the health care fraud investigation, Government investigators noticed that the defendant deposited few checks issued by patients into his primary business account at the Bath Savings Bank despite the fact that many patients stated that they issued checks to pay for co-payments or for nutritional supplements sold by the defendant. After the Government obtained a canceled check paid to the defendant from one of the patient's bank records, it was determined that this check and hundreds of others paid to the defendant from his patients in Maine were deposited into an account at Chase Manhattan in New York City. The Government later learned that this account was opened in the name and social security number of the defendant's sister, who lived and worked in the New York area. According to his sister, the defendant asked her to open this account in 2000 so he could have an operating account in New York. As stated above, the defendant traveled to New York each month to treat patients.

---

[1] Although Progressive Insurance agrees with the Government's loss calculation with respect to the fraudulent claims paid by Progressive, it is also seeking additional restitution in the amount of $1,432.59 to cover investigative costs. According to the Progressive representative, this figure represents the cost of the man-hours spent by that company's Special Investigations Unit to investigate a false claim submitted that was later included in the Government's loss calculation. If this amount is added for restitution purposes, then the total loss for Progressive is $2,157.59 and the total loss for all victims is $101,873.73.

The IRS analyzed this account and determined that most of the deposits to this account consisted of checks from patients in Maine. According to the defendant's return preparers, they prepared the defendant's tax returns based upon total income figures provided by the defendant or by analyzing bank statements from the Bath Savings Bank account. The defendant told his preparers that he deposited all business receipts into the Bath Savings Bank account and he never disclosed to them that he used an account in New York into which he deposited hundreds of thousands of dollars in business receipts.

Using the bank deposits method of proof, the IRS determined that the defendant failed to report approximately $841,572 in taxable income for the years 2000 to 2003 and evaded taxes totaling approximately $319,675. In May of 2007 the defendant paid the IRS a total of $728,098 for taxes, interest and penalties after counsel for the defendant had asked the Government to provide estimated figures so that the defendant could avoid accruing additional amounts of interest while awaiting the completion of the investigation.

Overall, the evidence suggests that the defendant is a well-educated medical professional who used his training and knowledge of CPT billing codes to cheat insurance companies out of at least $100,000. This figure was calculated based upon twenty-three families interviewed by the Government. Many more patients were not contacted during the investigation. In addition, the defendant hid hundreds of thousands of dollars in taxable business receipts in an account that he asked his sister to open in New York which he failed to disclose to his return preparers. As a result, he evaded more than $300,000 when he earned more than enough income to live comfortably and pay his fair share of taxes at the same time.

B.  <u>Need for the sentence imposed to reflect seriousness of the offense, promote respect for the law, and provide just punishment</u>.

As set forth in Section 3553(a), a sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. The Government submits that although these are white-collar offenses and the victims are insurance companies and the U.S. Treasury, the Court must still consider these offenses to be very serious offenses for which substantial jail time is an appropriate punishment. A sentence that does not include a lengthy prison term will send the wrong message to this offender and to other medical professionals and taxpayers that committing health care fraud or tax evasion might be worth the risk if the criminal penalties were slight compared to the risk of being discovered and successfully prosecuted. Health care fraud and criminal tax offenses are two of the most complicated and difficult matters to investigate and prosecute. The guidelines for health care fraud and tax evasion measure the harm by the total loss caused by the offenses. The Sentencing Commission's fraud loss and tax loss tables and the other factors that are included in the guidelines calculation in this case, produce a jail range that is reasonable when compared to the seriousness of the offenses.

C.  <u>Need for sentence to afford adequate deterrence</u>.

A sentence must also be sufficient to afford adequate deterrence to others, which in turn helps promote respect for the law. The defendant's sentencing memorandum provides lengthy testimonials from patients who believe that the defendant's alternative healing techniques helped them lead more productive lives. Putting aside the question of whether these healing techniques are even reimbursable treatments, the Court must consider whether the good deeds of an educated and well-trained professional should be sufficient to cut that defendant's jail time in half. Another individual who committed the same crimes as the defendant but who worked in

-11-

the billing department of a medical office would not be in a position to make the same argument simply because he was not involved in caring or treating patients.

Moreover, in the case of criminal tax offenses, the Government submits that a lengthy jail sentence is necessary to deter others from committing similar crimes. As the Sentencing Commission points out in the introductory language to U.S.S.G. § 2T1.1:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offenses should act as a deterrent to would-be violators.

U.S.S.G. § 2T1.1 (commentary). If the Court gave the defendant a downward departure or variant sentence based upon the arguments set forth by the defendant, the wrong message will be sent to the community about the seriousness of criminal tax crimes and it could have a detrimental affect on tax compliance. As the Court knows, the federal tax system in this country depends upon voluntary compliance. The government relies on its citizens to file accurate tax returns and pay the amount due at the time required by law. However, this system of voluntary compliance only works if people believe that the system is fair. If a wealthy and prominent medical professional is given a sentencing departure because of his good deeds or because he could afford to pay his additional taxes, interest and penalties during the criminal investigation, before the IRS assessed these amounts, it will send the wrong message to the public and have a negative effect on tax enforcement. The message that the public will perceive, rightly or wrongly, is that wealthy professionals who could afford to write a large check out to the IRS will not have to suffer the same punishment that anyone else would face if they committed the same

crime.

    D.  <u>Need for sentence to protect the public from further crimes of defendant</u>.

The defendant currently resides in California and is not licensed to practice in that state. Although it is not known if the defendant will apply to become a licensed chiropractor in California after he completes his sentence, the sentence imposed upon the defendant must be sufficient enough to deter him from committing future crimes of health care fraud and tax evasion should he try to become licensed in that state. The Government notes that the defendant voluntarily surrendered his chiropractic license in New Jersey in 1992 after a billing complaint was filed against him in that state. He was not charged with a crime. Shortly thereafter, he moved to Maine, obtained a license to practice in Maine, and engaged in a scheme to defraud insurance companies by submitting false and fraudulent claims for reimbursement. Now that he has been successfully prosecuted, this Court must impose a sentence that convinces the defendant that this fraudulent conduct is not worth the price.

    E.  <u>To provide defendant with adequate educational or vocational training</u>.

The defendant is well-educated professional who needs no additional educational or vocational training that could be offered in prison. Nevertheless, for the other reasons stated herein, a lengthy term of imprisonment is justified in this case.

    F.  <u>Kinds of sentences available</u>.

The defendant's sentence should include jail, supervised release, and full restitution.

    G.  <u>Kinds of sentences and sentencing range established by guidelines</u>.

As stated above, although the guidelines are now advisory, this Court should still take notice of the sentencing range recommended by the guidelines. The guidelines take into account

the harm caused by the defendant's conduct, along with his lack of criminal history and acceptance of responsibility.

        H.      <u>Any pertinent policy statement</u>.

As stated above, the Guidelines Commission believes that deterrence is the primary factor to consider in criminal tax cases. Furthermore, the Commission noted that the tax offense guidelines were written to increase the average length of sentences compared to pre-guideline tax sentences. It stated,

> The Commission believes that any additional cost of imprisonment that may be incurred as a result of the increase in the average prison term is inconsequential in relation to the potential increase in revenue.

U.S.S.G. § 2T1.1 appl. notes (background).

Moreover, the sentencing guidelines also state that departures based upon a defendant's mental and emotional condition (U.S.S.G. § 5H1.3), employment record (U.S.S.G. § 5H1.5), family ties and responsibilities (U.S.S.G. § 5H1.5) and record of good work (U.S.S.G. § 5H1.11) are ordinarily not relevant in determining whether a departure is warranted. Thus, to the extent that the defendant seeks a guideline departure or variant sentence based upon his violent childhood, his current emotional condition, his employment as a chiropractor and record of good work in that profession, and the fact that his wife will be residing alone in a small home in a rural area of northern California, the Sentencing Commission has determined that these factors would not ordinarily be relevant.

        I.      <u>The need to avoid unwarranted sentence disparities</u>.

The Government submits that the Sentencing Guidelines also serve to avoid unwarranted sentence disparities for similarly situated defendants in different parts of the country. By

sentencing a defendant based upon the total tax loss plus other standard factors considered by the guidelines, Courts can impose similar sentences for defendants who committed similar crimes regardless of where they live. This is especially important in criminal tax cases. If defendants in one district are treated more leniently than defendants in another district, it would contribute to the perception that the tax system is not fair and that criminal defendants will be sentenced differently depending upon where they commit the crime.

        J.        <u>Need to provide restitution</u>.

Providing restitution is especially important in fraud and tax cases. The Government notes that the defendant has already paid the IRS for the criminal tax loss and, according to the Defendant's Sentencing Memorandum, he is prepared to pay restitution to the victims of Count One shortly after he is sentenced.

**III.    Government's Sentencing Recommendation.**

The defendant, a well-educated professional, engaged in a scheme to defraud insurance companies and the U.S. Treasury over a five-year span resulting in losses totaling more than $400,000. According to the U.S. Sentencing Guidelines, deterrence for tax offenders should be the primary factor for the Court to consider. The defendant, however, seeks an effective departure of more than 50% below the low end of the advisory guideline range. In support of this recommendation, he cites to the fact that he is a first-time offender and he accepted responsibility by waiving indictment and agreeing to plead guilty. However, most medical professionals prosecuted for health care fraud and most criminal tax defendants have little if any criminal history. The Government submits that this defendant's lack of criminal history and his acceptance of responsibility have already been factored into the guideline calculation.

The defendant also cites to the testimonials of former patients who attested to his skill as a chiropractor. He also cites to the fact that he grew up in a home with a violent father, and that he suffered emotional distress after he discovered the bodies of his parents after his father murdered his mother and committed suicide. As stated above, these factors are all not ordinarily relevant when determining the appropriate sentence if the policy considerations of the Sentencing Commission are considered.

The defendant also argues that the "loss of his career and a grave diminishment of his future income" weighs in favor of a below the guideline sentence. However, when the defendant's past income level was based, in part, upon fraudulent insurance billings, this argument could not possibly be used to justify a shorter sentence. Moreover, the availability of other sanctions does not ordinarily justify a reduced jail term. See United States v. Jimenez-Beltre, 440 F.3d 514, 520 (1st Cir. 2006)(district court judge was reasonable to deny a below guideline sentence for a defendant convicted of re-entry after deportation on the grounds that the defendant faces immediate deportation).

The defendant also recommends a short period of home detention to follow. However, as he states in his sentencing memorandum, his current home has no power other than that supplied by a generator and solar panels. Therefore, it is not at all evident that he could be outfitted with an electronic monitoring device should his sentence include a period of home detention.

The Government recommends that the appropriate sentence in this case is a sentence within the advisory guideline range of 24 to 30 months, to be followed by a term of supervised release. The Government also requests that the defendant be ordered to pay restitution in the amount of $100,441.14 for the losses suffered by the insurance company victims in this case

with respect to amounts paid on fraudulent claims. The Government also notes that Progressive Insurance seeks additional restitution in the amount of $1,432.59 for "investigative costs." Finally, the Government takes no position the amount of fine, if any, the Court should impose.

Such a sentence will be sufficient to protect the public and deter others medical professionals from defrauding insurance companies when they believe insurance does not adequately reimburse for their services. A lengthy jail sentence will also serve to deter other members of the public from filing false tax returns and evading their fair share of federal income taxes. Because this country relies on a system of voluntary compliance, it cannot afford to send the message that a defendant convicted of tax evasion faces only a slap on the wrist and an order of restitution.

**IV.  Conclusion.**

For the reasons stated above, the defendant's request for a guideline departure and a variant sentence should be denied.

Dated: October 20, 2008

Respectfully submitted,

Paula D. Silsby
United States Attorney

By:  /s/
James W. Chapman, Jr.
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2008, I filed the foregoing Government's Sentencing Memorandum with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

>Jay P. McCloskey, Esq.
>McCloskey, Mina, Cunniff and Dilworth
>27 Bellevue Avenue
>Bangor, ME 04402
>jmccloskey@lawmmc.com
>
>Thimi R. Mina, Esq.
>McCloskey, Mina & Cunniff, LLC
>12 City Center
>Portland, ME 04101
>207-772-6805
>207-879-9374 (fax)
>tmina@lawmmc.com

>Paula D. Silsby
>United States Attorney
>
>\_\_\_\_/s/_____
>James W. Chapman, Jr.
>Assistant United States Attorney
>United States Attorney's Office
>100 Middle Street
>East Tower, Sixth Floor
>Portland, Maine 04101
>(207) 780-3257
>James.W.Chapman@usdoj.gov